Good morning, your honors. Lester Marston on behalf of the Chemehuevi Indian Tribe and the land of Sionese in this case. And it's a pleasure to be in front of you again. Nice to see you again. This case involves the interpretation and really working out how three statutes interrelate. The Non-Intercourse Act, Section 81, and in our position, Section 476 of the Indian Reorganization Act. The government takes the position that the Secretary can't approve these land assignments because it violates the Non-Intercourse Act. The prohibition in the Non-Intercourse Act that prohibits any conveyance or alienation of Indian lands without the approval of the United States government. That decision of the district court and the government's position is wrong. And it's wrong because their interpretation of Section 81 violates the very regulations that the Secretary has enacted in order to carry out the statute. Since this is a statute that deals with an area of law that's highly specialized, why shouldn't we afford the agency Chevron and, where appropriate, our deference? Well, first of all, because the tribe's interpretation of the statute is consistent with the Secretary's interpretation of the statute as set forth in the regulations. You have to remember that when the Secretary first promulgated the regulations under the statute, and the statute authorizes him to define by regulations which contracts should be excluded from the coverage of the statute, the Secretary issued a proposed rule and published it in the Federal Register and said, tribal land assignments don't fall within the coverage of the statute. Then the Secretary came back after receiving comments and said, no, land assignments only of a temporary nature, less than seven years, aren't covered by the statute. So are you suggesting that under the APA, that because of public comments, if the Secretary changes his or her mind about this as a result of those comments, that that somehow vitiates the agency's ability, right, to get Chevron or our deference ultimately based on what regulation is promulgated? Well, I think the Indian Cans of Construction trump Chevron deference. What case law do you have to support that? The case law that I have is the United States Supreme Court's decision in Montana v. Blackfeet Indian Tribe that was handed down by the Supreme Court after it handed down the Chevron case. And I put a lot of emphasis on those words that the Supreme Court set forth in that case. They said standard principles of statutory construction do not apply in cases involving Indian tribes. And those standard principles of statutory construction include those principles that the agency should be given deference. This is the fiduciary whose conduct is to be judged by this Court based upon the highest moral obligations and trust measured by the most exacting fiduciary standards. But you don't even have to go to the Chevron deference of the Indian Cans. Why? Because you have the Secretary's regulations. I've got to stop you there. You differ as to deference-owed regulations versus I-B-L-I. I-B-I-A. No, I'm kidding. I-B-I-A. Thank you. Decisions. Is that the difference you're drawing here? Well, the Interior Board of Indian Appeals sits in place of the Secretary. The Secretary is still bound by his own regulations. And that's what's happened here. This is the rub. The United States government has pulled out of thin air, out of the hat, so to speak, some new criteria. The Secretary has defined specifically what constitutes an encumbrance. And he says it's an exclusive right or almost an exclusive right of possession to use tribal land for more than seven years. And he specifically defined what kinds of contracts fall within the coverage of the statute. And, again, it's a contract that conveys an encumbrance. Well, that's exactly what these land assignments do. Now, the Secretary comes in and says, well, but somehow these Indian land assignments convey more than a mere encumbrance as Congress intended under the statute. Well, why do you even have to go to the legislative history of the statute? Congress said, Secretary, define what constitutes an encumbrance and define what contracts fall within the coverage of the statute. The Secretary did that. The government concedes that these land assignments are encumbrances as defined by the Secretary's regulations. They concede that these are contracts that are within the scope of the coverage of the statute. So then why doesn't the Secretary have the authority to approve them and remove the 177 prohibition? Because that's what the Secretary's action does. It's the approval of the government that removes the prohibition and makes these land assignments valid so that they don't violate federal law. So why did Congress put in the statute that the Secretary can't approve these things if they violate federal law? Well, you know, if you look at the other alienation statutes, like Section 415, it doesn't contain that language. But could the Secretary of the Interior approve a lease if it violated federal law? My position would be no. So why did Congress put that language in there? Well, you have to go back and look at the history of how Section 81 evolved. And initially, it was a contract for services relative to Indian lands that the Secretary was authorized to approve. And nobody really knew what that meant. And what was coming before the courts were these management contracts, management contracts to manage Indian land for gaming facilities or for gas stations. And what was happening was these contracts were coming in, and they were just set forth the standards for operation and use, like a gas station, but didn't have any provisions in the contracts that said, well, if you're operating a gas station, you've got to comply with the Underground Fuel Storage Tank Act or the Clean Air Act. So Congress really wanted to emphasize and make it clear to the Secretary that when you're looking at these encumbrances, you want to make sure that there's compliance with all the other federal statutes. If that's the case, I mean, you're familiar with the legislation that authorizes certain tribes to give extended leases, like a 99-year lease. Why would that be necessary if the Secretary could do that under this section? Well, the Secretary can't do that under this section because the regulations that he promulgated specifically state that what falls outside of the coverage of Section 81 is any type of conveyance of Indian lands that is to be approved under other authorizing federal statutes. So there's already a statute that authorizes the Secretary to lease land, 25 U.S.C. Section 415. There's already a statute that authorizes the Secretary to grant interest in Indian land for rights of ways, for pipelines, for telegraph lines. Those are taken outside of the coverage of the statute. What Congress intended to do was to fill in the gaps. They wanted to promote economic development. They wanted to allow Indians to be able to use their land and develop it and remove the 177 prohibition. And so this was kind of like a catch-all. Right, except, you know, what's happening here is awfully close to a conveyance. I grant you that the ordinance says the tribe keeps title, but it's awfully close to a conveyance. I beg to differ with you. First of all, remember, the Secretary defines it as an exclusive or almost exclusive right to possess tribal land. Why isn't it almost exclusive? Well, it is. So it falls within the coverage of the Secretary's definition of an encumbrance. But it is very limited. It's not a sale. The assignee can't use it for any purpose. They can only use it for residential purposes. And even when they use it for residential purposes, they have to comply with tribal law, the subdivision ordinance, the zoning ordinance. They can't use it. But that's a little different than, for example, a condominium for adults in California. You can only use it for people who are over 55. And they have all kinds of restrictions in the deeds and the like. It's still a conveyance. It most certainly is. It's a conveyance of an interest in Indian lands. It's an encumbrance. But this is the reservation. This is the homeland. This fulfills the purposes for which the reservation was created. Congress enacted Section 476 and gave a congressional delegation of authority to this Indian tribe to enact a constitution. And in its constitution, they said, we shall have the power to issue land assignments to our members and determine the terms and conditions under which our members will occupy this reservation. And the secretary approved that constitution. You had to be there when the flood happened. This is a beautiful valley, 500 feet on both sides. It was like Yosemite. The Colorado River ran down the middle of it. Beautiful, fertile lands. All the Chemehuevis lived there. And then the government came so that people in L.A. could get water. They came and said, you've got to leave. Pack your bags. Imagine right now, Your Honor, if you had to leave. The government came to you and said, leave. Pack your suitcase and get out. Leave your home. Leave your job. We're not giving you any money to relocate and go. Chemehuevis scattered. They went to L.A. They went to San Francisco. They went to Phoenix. Now, a member of the Chemehuevis right in this courtroom, Herb Pruden-Segal, he lives right here in Burbank. Bought his house in 1978. Paid $100,000 for it. Is he going to sell that? And in this economy, that house is probably worth $600,000. Is he going to sell that house and take that $600,000 and move out to the high mesa desert lands where it's 130 degree heat sometime and reinvest in the reservation and build a new home? Not if he knows during his lifetime and the lifetime of his children, his children might be standing in front of a tribal council wanting a renewal of a lease and not get it. But you can get a 50-year lease without doing anything, true? That won't last. I intend to. That's the remedy that the secretary suggested, right? No, but it's not a remedy. My wife and I, we live in Ukiah, California. My wife's a member of the Chemehuevi Indian tribe. She's going to live probably for hopefully another 30 years. And our children are in their 20s. And if we want to leave it to our son, that lease, even with 25 years with a right to renew, is going to expire during his lifetime. And if there's a family there that he's not in the political ends with, they're not going to renew his. If we sell our home, and our home's worth a considerable amount of money, if we sell our home and invest in the reservation and build that home, you know, it's a beautiful mansion on the lake, you know. And if the political powers that be don't like you and they're going to give it to somebody else, that's what the Chemehuevi's real life. It comes back to, I guess, the original question, which is basically this is as close to a fee conveyance as you can get. No, it's not. I mean, fee simple absolute. If you come to buy my house, fee simple absolute, you can sell it, you can alienate it in any way you see fit. If you come to me and you want to buy a piece of land and I tell you, you know what? You can't use it for any other purpose than to build a residential house. You can't use that property to violate any law. You've got to use it in accordance with tribal laws. And if you, when you die, it goes back to the tribe, unless you have children that are enrolled members of the tribe. Or you can sell it to another enrolled member. No, you can't sell it. You can assign it. You can assign it to another enrolled member. And that assignment still has to be approved by the tribe. It's a very limited conveyance. I assume the value of this interest reflects all of the restrictions that are placed on it, right? That's correct. But again, why was the reservation created? I guess what I deal with on this, I mean, frankly, my heart's with you. I really, this is a terrible, terrible, terrible story. And as I read it, I thought about burying my heart at wounded knee, and I thought of all the injustices that have been done. But our job is to construe the law. Correct. As Congress chose to impose it. And I'm just struggling with it. It seems to me that what you're saying here is that the Secretary listened to what the public comments were, changed the regulation, and it fouled things up. But we're still stuck with a final regulation that we have to deal with. And as my colleague pointed out, what you have here is an assignment that looks very, very, very much like a conveyance. It was designed to fill into the interstitia of the regulation, get as much of the bundle of sticks we used to talk about at law school as possible. And don't fault anybody for that. The question is whether that's enough to get you around 177, the 81 conundrum. And it is a conundrum. It really is. Well, I look at 177. The purpose of that statute was to protect the Indians so they didn't sell their land to a third party without the government's approval. Now I look at Section 81, and it allows for the government's approval as long as that alienation of the land, as defined under Section 77, meets the requirements of the definition of an encumbrance. And I'm a lawyer.  And the government has promulgated regulations that indicate that what the tribe wants to do doesn't meet the definition. At least that's the argument. But it does. It does. The definition of an encumbrance is a conveyance that conveys an exclusive or almost exclusive, I'm quoting, interest in tribal land to a third party for more than seven years. The secretary didn't say for more than seven years but less than 100 years. The secretary didn't say for more than seven years or less than 200 years. He said for more than seven years. And there's no difference between that conveyance and the types of conveyances that the government approves all the time, where the tribe comes with a management contract for a management group to come in and manage a gas station. And the term of the management contract is that the management contract shall stay in effect until it's terminated by the tribe. And the tribe has the right to terminate on so many days' notice. That contract stays in effect forever until the conditions of the contract are exercised. Same thing with the land assignments. That land assignment doesn't stay in effect forever. Actually, if the tribal member dies and they don't have an heir or they don't will it to somebody, it ends. It reverts back to the tribe. And even if they use it for the purposes for which it's given, if the tribe decides that it's in the best interest of the tribe to use that land to fulfill some other governmental purpose, the tribe can step in and they can condemn it. And all they have to do is pay the Indian for the value of the improvements that they made to the land. So, again, I go back to the fact I'm a lawyer. I don't deal in supposition and pulling things out of the hat. I look at the statute and I look at the regulations. The regulations are clear. It defines encumbrance. It defines the types of contracts that fall within the coverage of the statute. These land assignments are encumbrances. They fall within the coverage of the statute. The secretary is authorized under Section 81 to approve it. And if he approves it, that's the consent of the government under Section 177 and there's no violation of 177. Thank you, Counsel. Good morning, Your Honors. May it please the Court, my name is Tecla Hanson-Young and I represent the Department of the Interior. Interior is sympathetic to this tribe's desire to assign its members, convey its members a permanent exclusive possessory interest in tribal land. The problem is that Interior is not permitted to authorize this kind of a transaction under Section 177 and this Court should defer to Interior's judgment on this issue. Interior, as was mentioned in... We don't defer to judgments. We defer to interpretations and constructions of statutes. Sure. Unless it's a purely discretionary decision, which this is not. True? This Court should defer to Interior's interpretation of Section 177 as prohibiting this kind of a land transaction as impermissible conveyance under Section 177. Interior found that Section 177 bars this kind of transaction because of the broad, all-inclusive language in Section 177 and the fact that Section 177 specifically says, prohibits leases, grants, or other conveyances of land or of any title or claim thereto. That broad and inclusive language has been interpreted by the solicitor as prohibiting any kind of creation of an interest in tribal land unless there's some congressional approval to do so. Congress has given congressional approval, given approval to Interior, or given authorization to Interior to approve certain kinds of transactions, for example, leases, 50-year leases or 25-year leases, easements, rights-of-way, things like that. But Interior found that nowhere did Congress give it the approval, the authorization to approve or permit this kind of a land transaction where what was trying to be accomplished was a conveyance, a perpetual conveyance of exclusive possessory interests combined with the rights of alienation and dissent. And as is demonstrated in what the tribe submitted to Interior at record page, at excerpts page 587, the tribe was really trying to obtain Interior's approval of these deeds so that its tribal members had the assurance that these deeds could not be revoked by the tribe. So let's assume you just had a straight 99-year lease and you didn't have a right of alienage. Would that be acceptable under the statute? There's no statute that would authorize a 99-year lease here because this tribe hasn't obtained congressional approval to get a 99-year lease, although it can get a 50-year lease or it can get a 99-year lease. I'm talking about just a straight application of Section 81. To a 99-year lease. With no right of alienage. Under the tribe's interpretation or under Interior's interpretation of the statute. Well, I'm asking for Interior's interpretation. I know what their interpretation is. If you say yes, of course you can do it. Yes, under Interior's interpretation of the statute, a 99-year lease, which would convey a possessory interest for 99 years, would not be permitted under Section 81 because Section 81 only permits contracts that encumber Indian lands. Why doesn't this encumber the land? This certainly does, a leasehold interest would. Interior found that these deeds not only encumber Indian lands, but they also convey a possessory interest. So it would help this Court to look at specific examples of encumbrances that were given in the comments to the regs and in the legislative history. To answer Judge Thomas' question, what about a 99-year lease? That would not be permitted under Interior's interpretation. But why? It encumbers the land. There's certainly a possessory interest for 99 years. So what is it about it that doesn't qualify? Leases were meant to be governed under the leasing statutes. So under the regs, I think at 84.03 or 84, it talks about what types of contracts are excluded from review under this regulation. And it says any kind of contract that should be governed by another statute. And then other statutes govern leases. So a 99-year lease is not permitted under any circumstance because it's not permitted under the leasing statutes. But a life estate would be? The IBA's decision indicates that a life estate might be permissible. It's unclear if a life estate would be permitted under a temporary land assignment, which is also not governed by these regs and this statute. And the reason why land assignments are not governed here is because land assignments are, in essence, licenses that are revocable by the tribes at will. And that is why the tribe here doesn't want this to be considered a land assignment not governed under Section 81 because it doesn't want it to be revocable at will. And this tension was reflected in the regional director's briefing to the IVIA. The regional director originally said interiors shouldn't have to approve this at all because it's a land assignment and it should be governed by tribal law. And land assignments are essentially licenses. They don't convey any interest in property. It's just at the permission of the tribe. And the tribe said no, these do convey an interest in property. They're not just an assignment. It's not just a license. It's a conveyance. So the tribe, unfortunately what the tribe wants is not permitted by Congress. It's been prohibited by Section 177. And Interior, interpreting its authority under Section 81, found that it had no authority under Section 81 to grant or approve this kind of contract. And this Court could disagree with that interpretation, but there's no evidence in the record that shows Interior failed to consider an important element of the problem. Did you find a little out of deference when the agency's taken conflicting positions? I don't mean that facetiously, but we do have. When we've talked about Chevron deference and other even Skidmore deference, when the agency has not been consistent, it's awfully hard for us to say this has been a reason, thought out, well and long applied application of the statute. Well, the agency has, the IBA's decision is final for the agency. So that is the only position the agency has taken here. The regional director's decision is not final for the agency. So the agency has not taken an inconsistent position before this Court. The Court isn't reviewing any kind of inconsistent position. I think the difference in opinions before the agency reached its final decision simply indicates that this is a unique situation. There has never been a tribe that has submitted this kind of a deed for approval to the secretary because typically tribes don't want the secretary to be involved in their internal affairs. That was the reason why Section 81 was amended, to narrow the scope of transactions that needed to be reviewed and approved by the secretary. And so it's a very unique situation to have the tribe asking for the government to give some sort of assurance to its members that it's not going to revoke its permission to use tribal land in the future. Well, you can understand why, because why would anyone want to invest there unless they had the assurance that they could continue the investment, that they would have some ownership and value in it, and they could mortgage the interest if they wanted, and so forth. That is true, and Interior was sensitive to that dilemma. And what Interior's recommendation was, was to go through the 50-year leasing statutes if the tribe wanted to do that. And actually, the tribe and individuals can obtain mortgages through the 50-year leasing. Right, you can do that. But I think the point that counsel is making is that 50 years really is not long a time if you're talking about investing and wanting to divest yourself of the interest and have, you know, you can't sell the home. I mean, it's a... That's true, but that's exactly what Congress intended to prohibit in passing 177 and in failing to ever amend 177 or lessen its scope. Congress made a decision that the government needs to protect the tribe's tribal land base. And while this particular tribe wants to be able to, in essence, alienate its tribal title, Interior has to govern, has to implement the laws for all Indian tribes, and Congress has not backed down on its requirement that alienation is not allowed unless Congress has approved it. It's made that decision. Let me ask you this in terms of the consistency point that my colleague has raised. I'm aware that in the greater Palm Springs area there are thousands and thousands of lots owned by people of various, I don't know how many of them are Indian tribe members, probably very few, but they lease land from Indian tribes that are subject to periodic renewal. I assume that has occurred under the leasing statute. Is that right? Yes. Was that taken into account in determining whether a lease was a viable economic approach when you suggested that to the tribe? I believe it was because both the regional director and the Interior Board of Indian Appeals suggested that the leasing statutes were an option for the tribe to go forward with its assignment plan and would allow the tribal members to obtain mortgages to invest in the reservation. I mean, the problem ultimately is the tribe is asking for Interior to approve something that it has no authority to approve, and Interior can't rewrite the law. It is stuck implementing what Congress has given it to implement. And the distinction is not obviously the possessory interest because you would have that in a lease. The issue here is alienage of a right that would continue essentially indefinitely, subject to the restrictions that you have imposed. Well, the nature of the interest is a component of it because leases aren't governed, leases are governed separately under the statutes. But it is also, Interior also looked at, beyond whether it was a possessory interest, what other kinds of interests were conveyed in the deeds. And there was the right of alienation and dissent. Tribal members can actually lease out their lands with the approval of the tribe. And those features of these deeds made the deeds prohibited under Section 177. And Interior also was applying its prior precedent in reaching this decision. There's a 1942 solicitor opinion, the Colville Reservation opinion, in which Interior previously found that it was not authorized to approve deeds that are very similar to this because of the prohibition in Section 177. So Interior found nothing, no other statute, no statute at all, that gave it the authority to approve this kind of a transaction that the tribe presented it with here and gave recommendations to the tribe to pursue other options. The tribe doesn't want to at this stage, or at least it appears not to want to, but the tribe can get financing if it decides to go with the lease option. You're talking about just the 50-year lease. The 50-year lease option, yeah. And that's unfortunately the only remedy that Congress has made available to tribes who want to obtain financing for construction of homes and other residences on tribal properties. Interior is bound by what Congress has required here. If there are no other questions, I would just ask this Court to affirm the decision of the District Court and defer to Interior's interpretation of Section 177 as barring these assignment deeds. Any other questions? We'll give you two minutes for rebuttal. Two minutes. First of all, there was an incorrect statement that was made. There is actually a provision in the assignment ordinance that prohibits the assignees from conveying any interest in their assignment to any other party and prohibits them from allowing anybody else to use the property other than the assignee for the purposes of building a home and living in the home. But if you listen to what the government's argument is, and the problem again that I have with it is you don't find it anywhere in the statute or anywhere in the regulations. Really what they're saying is because these land assignments can just continue to go on, they're kind of tantamount to a sale because they can go on for a long time. Well, but neither the statute nor the regulations prohibits that. And management contracts, as the example I gave you, that contain a provision that says that they shall remain in effect until terminated by mutual agreement of the parties or by the tribe at its option have the potential for staying in effect forever as well. The question, you know, again, we're lawyers. We're bound. We look at the law. We look at the statute and the regulations. And if these land assignments, which the government concedes are encumbrances, and are contracts that fall within the purview of the statute, if the secretary somehow doesn't have the authority to approve that, then doesn't that render Section 81 a nullity? I mean, what contracts are covered and what aren't? They're either an encumbrance and a contract as defined by the secretary's regulations or they're not. And the mere fact that they may go on, you know, Herb Peninsula, if he gets a land assignment, you know, when he's 20, if he lives to 125, it may go on for 125 years. He may not have any heirs. That may be the end of it. He may get a land assignment. Heaven forbid he dies in five years. It may last five years. The time element isn't involved in the statute or the regulations. It is an exclusive right or nearly exclusive right to possess Indian lands given to a third party. And will that exclusive right last more than seven years? If it does, then it's an encumbrance and it's a contract that falls within the coverage of the statute and the secretary has the authority to approve it. And it's the secretary's approval, it's the government's approval of the encumbrance that takes it out of the coverage of 177. That's it. I don't see this statute and the regulations being ambiguous. But if they are, I would argue that the canons of Indian construction trump Chevron deference. And why? Because the fiduciary, the trustee, could never interpret the law adversely to the best interests of the beneficiary. And the one thing that we do know here, the one thing that you do know is this reservation was created for a homeland for these Indians, to fulfill the purposes for which the reservation was created. 177 was designed to protect the Indians so they weren't given their land away so they couldn't use it. These Indians aren't doing that. They're using it. It may be held in trust for the tribe, but the tribe is simply a collection of its members. And it's decided in its infinite wisdom, in an exercise of its governmental authority, how it wants its members to use its land. And Section 81, Congress never thought about this situation when they enacted Section 81. What it was trying to do was it was trying to remove the ambiguity of the former statute and allow Indians to be able to use their land for economic development, for other purposes. And that's exactly what the Chemehuevis are doing here. So I don't think the statute's ambiguous. I think that the Secretary has pulled this definition out of the air, out of their hat. You look at the regulations and how the Secretary has defined the regulations. It's clear he has the authority to approve it. If there's any ambiguity, then I think you need to construe the statute as the Indians understand it, not because it's the best interpretation, but because it's the Indians' interpretation. Thank you, Counsel. Thank you both for your arguments. The case just heard will be submitted for decision, and we will be in recess.
judges: Thomas, Smith, Christen